**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JINMEI ZHANG, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-cv-3283 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| MICHAEL SCHUSTER, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

### <u>MEMORANDUM OPINION AND ORDER</u>

This case involves a sting operation at a local massage parlor to investigate suspicions of prostitution. Members of the community complained to the Batavia Police Department about questionable activity at the Superb Spa, including dubious advertisements and odd comings-and-goings in evening hours. The police department asked the Department of Homeland Security for help, and a joint federal-state investigation got underway.

A federal agent, Defendant Michael Schuster, went undercover. He entered the spa with a wad of cash, and requested illicit activity from Plaintiff Jinmei Zhang. According to Schuster, Zhang responded by touching him in a sexual manner, at which point Schuster left the spa. The police placed her under arrest.

The state charged Zhang with a crime, but months later, the state dropped the case. At that point, Zhang filed the lawsuit at hand. She brought a collection of federal and state claims against Schuster and the police officers who participate in the raid, plus the City of Batavia.

After discovery, Defendants filed motions for summary judgment. For the reasons stated below, the motions are granted.

**Non-Compliance with the Rules**

Before diving into the record, the Court begins by calling attention to Zhang's failure to comply with the Local Rules.  It is not uncommon for parties to file a response to a statement of facts that does not comply with Local Rule 56.1.  But here, Zhang did not file a response at all.

The Local Rules require parties to follow a specific procedure when filing and opposing a motion for summary judgment.  All litigants – including *pro se* litigants – must follow the Local Rules, or face the consequences of non-compliance.  Zhang, a *pro se* litigant, is no exception.

Local Rule 56.1 governs the procedures for filing a motion for summary judgment.  The moving party must provide a "statement of material facts that complies with LR 56.1(d) and that attaches the cited evidentiary material."  *See* L.R. 56.1(a)(2).  That statement of facts must rest on evidence in the record, with user-friendly citations.  "Each asserted fact must be supported by citation to the specific evidentiary material, including the specific page number, that supports it."  *See* L.R. 56.1(d)(2).  A district court "may disregard any asserted fact that is not supported with such a citation."  *Id.*  A fact without evidence isn't a fact.

The moving party must submit the evidence that supports each of the proposed facts.  "All evidentiary material identified in LR 56.1(a)(2) and LR 56.1(b)(3) citations must be included as numbered exhibits with the statements of fact."  *See* L.R. 56.1(d)(3).

Local Rule 56.1 also explains how to respond to a motion for summary judgment.  The non-moving party must file a "response to the LR 56.1(a)(2) statement of material facts that complies with LR 56.1(e)."  *See* L.R. 56.1(b)(2).  That response "must consist of numbered paragraphs corresponding to the numbered paragraphs" of the movant's statement of facts.  *See* L.R. 56.1(e)(1).

To help *pro se* litigants, the Local Rules require parties to serve a notice that explains the procedure, so that they are not lost at sea. *See* L.R. 56.2. That way, unrepresented parties will receive clear instructions about what they need to file, and how they need to do it.

Substantial compliance with Local Rule 56.1 is not enough. *See Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004). All parties, including *pro se* litigants, must fully comply with Local Rule 56.1. *See Flint v. City of Belvidere*, 791 F.3d 764, 767 (7th Cir. 2015); *Collins v. Illinois*, 554 F.3d 693, 697 (7th Cir. 2009) ("[E]ven *pro se* litigants must follow procedural rules.").

Compliance is necessary for the smooth-running of the wheels of justice. The Local Rules are designed to give district courts the information that they need to assess whether a case deserves a trial. The uniformity of the procedure – across hundreds of cases on a district court's docket – promotes efficiency and speeds things along. It helps courts manage a pile of motions in a mountain of cases.

Consistent with the Local Rules, the Batavia Defendants filed a statement of undisputed facts with their motion for summary judgment. *See* Batavia Defs.' Statement of Facts (Dckt. No. 197). And Defendant Schuster also filed a statement of undisputed facts with his motion for summary judgment. *See* Def. Schuster's Statement of Facts (Dckt. No. 203). They supported each fact in their statements of facts with admissible evidence in the record. And Defendant Schuster served on Zhang a Local Rule 56.2 Notice that explained the requirements of Local Rule 56.1. See Rule 56.2 Statement (Dckt. No. 204).

But Zhang didn't respond. This Court does not mean that Zhang did not respond *correctly*. Instead, Zhang didn't respond *at all*.

Instead, she unleashed a barrage of motions on this Court. Since Defendants filed for summary judgment, Zhang has filed over 30 motions of her own, without responding to the motions for summary judgment. *See* Mtns. (Dckt. Nos. 213, 214, 215, 229, 230, 231, 237, 238, 239, 248, 249, 255, 256, 257, 258, 263, 265, 269, 270, 272, 273, 276, 279, 284, 286, 290, 291, 292, 295, 301, 303, 304, 311).

Zhang's motions cover a lot of ground and include multiple tries at the same request. Among other motions, Zhang moved to revoke the Court's grant of leave for Defendant Schuster to file an oversized brief (Dckt. Nos. 214, 230), moved to extract a video recording of Plaintiff's depositions (Dckt. Nos. 215, 231), moved for the judiciary to conduct a polygraph of Defendant Schuster (Dckt. No. 229), and moved for a new judge (Dckt. No. 244).

In these motions, Zhang stated that she would not respond to the motions for summary judgment until the Court resolved her motions, and that she could not respond because the Defendants failed to verify a deposition transcript. *See* Mtns. (Dckt. Nos. 249, 255, 257). But the Court did resolve each of her motions. And in any event, Zhang cannot set her own conditions for when she will file a response.

The Court even gave Zhang several extensions of time to respond to Defendants' motions. *See* 4/14/21 Order (Dckt. No. 218); 5/3/21 Order (Dckt. No. 242). But the deadline came and went months ago. And ultimately, Zhang never responded.

As a result, the Court accepts as undisputed the facts put forward (and properly supported) by Defendants. "Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." *See* L.R. 56.1(e)(3); *Olivet Baptist Church v. Church Mut. Ins. Co.*, 672 F. App'x 607, 607 (7th Cir. 2017) ("The district court treated most of the [defendant's] factual submissions as unopposed, because the [plaintiff] failed to contest them in

4

the form required by Local Rule 56.1(b). We have held that the district court is entitled to enforce that rule in precisely the way it enforced the rule in this litigation."); *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218 (7th Cir. 2015) ("When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion.").

But Zhang's failure to respond does not mean that the Defendants must prevail on the motions for summary judgment. While the material facts are undisputed, the burden remains with the movants, the Batavia Defendants and Defendant Schuster, to show that they are entitled to judgment as a matter of law. *See Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021); *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006) ("[A] nonmovant's failure to respond to a summary judgment motion, or failure to comply with Local Rule 56.1, does not, of course, automatically result in judgment for the movant.").

So, this Court's task is to view the undisputed facts in Zhang's favor, consider the claims in light of the undisputed facts, and decide whether there is any genuine need for a trial. With those standards in mind, the Court turns to the record at hand.

### Background

In early 2016, the Batavia Police Department received complaints from the community about suspicious activities and possible prostitution at the Superb Spa in Batavia, Illinois. *See* Batavia Defs.' Statement of Facts, at ¶ 8 (Dckt. No. 197); Def. Schuster's Statement of Facts, at ¶ 9 (Dckt. No. 203). Superb Spa was a massage parlor. *See* Def. Schuster's Statement of Facts, at ¶ 7. It's no longer in business.

Some of the complaints included copies of internet ads from websites known for advertising prostitution. *Id.* at ¶ 9. The advertisements listed Superb Spa's address and

promoted "pretty Asian girls massage[s]." *Id.*; *see also* Bodyrub.com Advertisement (Dckt. No. 203-2, at 191–195 of 289); Backpage.com Email (Dckt. No. 203-2, at 196–197 of 289).

Some of the complaints came from parents of children who attended the dance studio next to Superb Spa. *See* Batavia Defs.' Statement of Facts, at ¶ 9 (Dckt. No. 197). Parents noticed heavy traffic in the evening hours around the spa and men going into the spa, staying for short periods of time, and leaving. *Id.* at ¶¶ 9–10.

Based on the complaints, the Batavia Police Chief (Gary Schira) directed Sergeant Shawn Mazza to visit Superb Spa and speak with the owner. *Id.* at ¶ 12. Sergeant Mazza wanted to talk with the owner about the complaints and figure out what was going on. *Id.* So he visited the spa in March and April 2016. *Id.* at ¶ 13. But the owner wasn't there, and Sergeant Mazza couldn't get the owner's contact information. *Id.*

Unable to get in contact with the owner, Sergeant Mazza decided to reach out to the Department of Homeland Security for help. *Id.* at ¶ 14. Sergeant Mazza heard from police officers with the City of St. Charles, a neighboring jurisdiction, that St. Charles had worked with the Department of Homeland Security on prostitution complaints. *Id.* And since the Batavia Police Department did not have any officers with undercover experience, Sergeant Mazza thought Homeland Security could help. *Id.* at ¶ 15.

Sergeant Mazza directed a Batavia Police Detective, Kevin Bretz, to contact the Department of Homeland Security for assistance in conducting a compliance check on the spa. *Id.* at ¶ 16. Detective Bretz contacted Homeland Security Agent Tristan Stanger. They decided that Agent Stanger would bring a team on May 12, 2016, to brief the matter, and later conduct an undercover operation on the spa. *Id.* at ¶ 17.

6

Agent Stanger's team was part of Homeland Security Investigations ("HSI"), an agency within Immigration and Customs Enforcement, which itself is within the Department of Homeland Security. *See* Def. Schuster's Statement of Facts, at ¶ 3 (Dckt. No. 203). And Stanger's team was even more specialized, working in the Chicago Human Smuggling and Human Trafficking Unit of HSI. *Id.* at ¶ 12.

So they had a date, and Stanger had a plan. Stanger crafted an enforcement operation plan that HSI approved, and he engaged Michael Schuster, an HSI Special Agent, to serve as the undercover agent in the operation. *Id.* at ¶¶ 13–14.

On May 12, 2016, a group of HSI agents and Batavia Police officers met to discuss the operation. *Id.* at ¶ 16. Sergeant Mazza was in charge of the team from the police department, and Agent Stanger oversaw the team from Homeland Security. *Id.* at ¶ 15. According to the plan, Schuster was supposed to enter the spa, purchase a one-hour massage, and see if anyone talked about or arranged for sexual contact or sex itself. *Id.* at ¶ 17. If there was talk of sexual contact or conduct, he was supposed to exit the spa and relay that information to the team assembled outside. *Id.*

With the plan in mind, Schuster walked from the police department across the street to Superb Spa in plain clothes. *Id.* at ¶ 19. He entered the spa and encountered Plaintiff Jinmei Zhang. *Id.* at ¶ 20. She worked as a massage therapist at the spa. *Id.* He requested a one-hour massage. *Id.* at ¶ 20. He paid for the massage in cash (with funds from the Batavia Police Department), and Zhang led him to a massage room. *Id.* at ¶¶ 18, 20.

Once in the massage room, Zhang told Schuster to take off his clothes and lay on the table. *Id.* at ¶ 21. She proceeded to give him a massage. *Id.* at ¶ 22. Schuster asked Zhang

some questions, but the conversation was minimal because Zhang doesn't speak or understand English. *Id.* at ¶ 23. Zhang told Schuster that her name is Anna, and that she is from China. *Id.*

The key event took place at the end of massage. Schuster and Zhang offer two different accounts of what happened next.

According to Schuster, he pointed towards his genitals and toward some extra money and asked Zhang to touch him. *Id.* at ¶ 24. He says that Zhang then touched his testicles and the surrounding area. *Id.* Schuster says that he immediately terminated the contact and Zhang left the room. *Id.*

Zhang tells a different story. *Id.* at ¶ 25. As an aside, her story *is* in the record, even though Zhang never responded to the motions for summary judgment. In its statement of facts, the United States (who was substituted for Schuster) summarized Zhang's testimony about what happened in the massage parlor. So, her story is in the record, which means that the Court can and will consider it.

According to Zhang, Schuster repeatedly removed a towel covering him, gestured to his private parts, touched his own genitals, took or grabbed her hand, and asked her to massage his genitals. *Id.* Zhang testified that when she refused, Schuster stopped, got dressed, and left. *Id.*

The parties offer different versions about what happened next, too. The difference involves whether Schuster left before the officers arrived.

Schuster says he exited the spa and told the officers outside what had happened. *Id.* at ¶ 26. That is, he told the officers that, while he was on the massage table without any clothes, he started motioning toward his groin area, and Zhang began to fondle him. *Id.* But at deposition, Zhang testified that Schuster was in the back of the spa when the other officers entered. *Id.* at ¶ 33.

Either way, Schuster's location at the time of the arrest is not critical. What matters is what Schuster said to the police, not where he said it. Schuster told the officers that Zhang had attempted to engage in illicit behavior. *Id.* at ¶¶ 26, 28, 32. There is no evidence in the record that Schuster *didn't* share his account with the police.

After hearing Schuster's account, the HSI agents and Batavia Police officers (including Sergeant Mazza, Detective Bretz, and Agent Stanger) tried to talk with Zhang through a remote translation service. *Id.* at ¶ 28. Zhang was uncooperative and angry. *Id.* at ¶ 29. She wouldn't follow directions, and wouldn't identify herself. *Id.* She attempted to leave, and repeatedly attempted to go to the back rooms of the spa. *Id.*

So Detective Bretz placed Zhang on an investigative detention while the other officers secured the premises for their safety. *Id.* at ¶ 30. Detective Bretz then formally arrested Zhang and told her (through the translation service) that she was under arrest for prostitution. *Id.* at ¶ 31; Batavia Defs.' Statement of Facts, at ¶ 31 (Dckt. No. 197).

Batavia Police Officer Emil Jensen then transported Zhang, and her personal handbag, to the Batavia Police Department. *See* Batavia Defs.' Statement of Facts, at ¶¶ 34–35 (Dckt. No. 197). At the station, officers handcuffed Zhang to a bench. She remained there for three to four hours during the booking process. *See* Def. Schuster's Statement of Facts, at ¶ 36 (Dckt. No. 203).

During the booking process, Stanger interviewed Zhang, but she was uncooperative. *Id.* at ¶ 38. After the interview, HSI ended its involvement. *Id.*

Also, at some point during the booking process, Zhang requested her bag. *Id.* at ¶ 47. The officers searched the bag before giving it back to her, consistent with the department's

practice to ensure that there were no weapons inside.  *Id.*  While searching the bag, Detective

Bretz found several bundles of cash totaling more than $6,000.  *Id.*

Detective Bretz, believing that the money was prostitution proceeds, called the Kane

County State's Attorney's hotline.  *See* Batavia Defs.' Statement of Facts, at ¶¶ 38–39 (Dckt.

No. 197).  The State's Attorney advised Detective Bretz to confiscate the money as evidence of a

crime.  *Id.* at ¶ 39.  Sergeant Mazza and Detective Bretz seized the cash, putting the money in an

evidence locker in a sealed bag.  *See* Def. Schuster's Statement of Facts, at ¶ 49 (Dckt. No. 203).

Later, the Kane County State's Attorney's Office mailed Zhang a Notice of Pending

Forfeiture by certified mail explaining the authority for the forfeiture and how she could

challenge it.  *Id.* at ¶ 51.  But ultimately Zhang forfeited the money.  *Id.* at ¶ 54.

Detective Bretz later drafted and signed the criminal complaint charging Zhang with

prostitution in violation of 720 ILCS 5/11-14(a).  *Id.* at ¶ 39.  Once the officers completed the

booking process, Zhang posted a $150 bond and was released on conditions of bond.  Zhang had

seven conditions of bond:

> (1) Appear to answer the charge in court until final discharge or final order
> of the court; (2) Obey all court orders and process; not leave this State
> without permission of the court and report changes of address to the Clerk
> within 24 hours; (3) Not commit any criminal offenses while awaiting
> final order in this case; (4) If on appeal, prosecute the appeal, and
> surrender to custody if the judgment is affirmed or a new trial is ordered;
> (5) Surrender . . . OR not possess any firearms or dangerous weapons until
> final order in this case; (6) Not contact or communicate with any
> complaining witnesses or members of his/her immediate families; and
> (7) If the alleged victim is a family/household member, . . . you must
> refrain from contact and/or communication with the alleged victim and
> refrain from entering or remaining at alleged victim's residence for a
> minimum of 72 hours following your release.

*Id.* at ¶ 44.  Over the next few months, Zhang appeared in court at least six times.  *Id.* at ¶ 55.

Eight months after Zhang's arrest, in January 2017, the state dismissed the criminal charge against her on a motion for *nolle prosequi*. *Id.* After the dismissal, Zhang successfully expunged the proceedings. *Id.* at ¶ 57.

In May 2018, Zhang filed this lawsuit against Agent Schuster, Sergeant Mazza, Detective Bretz, and the City of Batavia. *See* Cplt. (Dckt. No. 1). Zhang is currently *pro se*, but she has had attorneys come and go at various times in the case.

Zhang amended the complaint four times. The Fourth Amended Complaint was filed by counsel, and it contains seven claims.

The first three counts allege Fourth Amendment violations. Count I alleges that Schuster, Mazza, and Bretz arrested Zhang without probable cause. *See* Fourth Am. Cplt., at ¶¶ 25–29 (Dckt. No. 121). Count II alleges that Schuster, Mazza, and Bretz unreasonably seized, or caused to be seized, over $6,000. *Id.* at ¶¶ 30–34. Count III is a claim against Schuster, Mazza, and Bretz for the liberty restrictions imposed by her bond conditions. *Id.* at ¶¶ 35–44.

Count IV deals with the Fifth Amendment. It alleges that Schuster, Mazza, and Bretz violated Zhang's due process rights by causing the creation and transmission of a false report and false criminal complaint. *Id.* at ¶¶ 45–49.

The last three counts are state law claims. Count V alleges that Mazza, Bretz, and the City of Batavia maliciously prosecuted Zhang. *Id.* at ¶¶ 50–56. Count VI is an indemnification claim against the City of Batavia. *Id.* at ¶¶ 57–60. And finally, Count VII alleges that Schuster violated the Illinois Gender Violence Act. *Id.* at ¶¶ 61–71.

Count VII is no longer in the case. The United States filed a notice of substitution for Count VII, substituting itself in place of Agent Schuster on the grounds that Schuster was a federal employee acting within the scope of his employment. *See* Notice of Substitution (Dckt.

11

No. 143).  The government then moved to dismiss Count VII on the grounds that Zhang failed to

exhaust her administrative remedies as required by the Federal Tort Claims Act.  *See* Def. United

States' Mtn. to Dismiss (Dckt. No. 145).  Ultimately, the Court converted the government's

motion to dismiss into a motion for summary judgment under Rule 12(d), and granted summary

judgment to the United States on Count VII.  *See* 4/13/21 Order (Dckt. No. 216).

As a result, there are six live claims.  Agent Schuster and the Batavia Defendants now

move for summary judgment on Zhang's claims.  *See* Def. Schuster's Mtn. for Summ. J. (Dckt.

No. 202); Batavia Defs.' Mtn. for Summ. J. (Dckt. No. 196).

For the reasons stated below, Defendants' motions for summary judgment are granted.

## Legal Standard

A district court "shall grant" summary judgment "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists if "the evidence is such

that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party seeking summary judgment has the burden of

establishing that there is no genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*,

477 U.S. 317, 323 (1986).  To survive summary judgment, the opposing party must go beyond

the pleadings and identify specific facts showing the existence of a genuine issue for trial.  *See*

*Anderson*, 477 U.S. at 256.

The Court construes all facts and reasonable inferences in the light most favorable to the

nonmoving party.  *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016).  The Court

does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather

determines only whether a genuine issue of triable fact exists.  *See Nat'l Athletic Sportswear,*

*Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

## Analysis

Zhang is suing both a federal agent and local police officers. Federal and state officers stand in different spots when it comes to the existence of a private right of action against them. The footing for each cause of action is much different.

A federal statute, 42 U.S.C § 1983, authorizes a civil action for a deprivation of rights against a person who acts under color of state law. So, Congress expressly authorized a private right of action against state actors, such as the officers from the Batavia Police Department.

But there is no corresponding statute authorizing suit against federal officers. Instead, Zhang sues Schuster (the federal agent) under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). But *Bivens* does not sweep broadly. It applies in a limited set of circumstances. So, this Court starts by examining whether Zhang has a cause of action against Schuster under *Bivens*.

## I. The *Bivens* Claims

In 1871, in the midst of Reconstruction, Congress enacted 42 U.S.C. § 1983. The statute allows a person to sue for money damages if an official acting under color of *state* law violated his or her constitutional rights. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1854 (2017). But Congress didn't enact a similar statute to recover money damages if an official acting under color of *federal* law violated a person's constitutional rights. There is no such statute on the books.

Instead, 100 years later, in 1971, the Supreme Court recognized an implied cause of action against federal officials for certain constitutional violations in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). But the Supreme Court in *Bivens* did not greenlight a private right of action against federal agents whenever they violate federal rights. Instead, the Supreme Court held that the Fourth Amendment provided an implied cause of action for a plaintiff who was arrested after a warrantless search of his home. *See Bivens*, 493 U.S. at 397.

In the next decade, the Supreme Court recognized an implied cause of action in two more cases. In *Davis v. Passman*, 442 U.S. 228 (1979), the Supreme Court recognized an implied cause of action under the Fifth Amendment Due Process Clause for gender discrimination. *See Davis*, 442 U.S. at 248. And in *Carlson v. Green*, 446 U.S. 14 (1980), the Supreme Court held that the Eighth Amendment's Cruel and Unusual Punishments Clause provided a damages remedy for failure to provide adequate medical treatment. *See Carlson*, 446 U.S. at 19.

Since then, *Bivens* hasn't grown, but it has undergone pruning. In the years since *Bivens*, *Davis*, and *Carlson*, the Supreme Court has "adopted a far more cautious course before finding implied causes of action." *Abbasi*, 137 S. Ct. at 1855. In fact, the Supreme Court has not extended *Bivens* in any direction in over 30 years. *Id.* at 1857.

The lack of an extension wasn't for lack of opportunity. Quite the opposite. The Supreme Court has "reversed more than a dozen appellate decisions" extending *Bivens*. *See Vance v. Rumsfeld*, 701 F.3d 193, 198 (7th Cir. 2012) (en banc). Time and again, the Supreme Court has received invitations to extend *Bivens*, and each time, it has declined.

That approach reflects first principles: Congress creates causes of action, but courts do not. Congress holds the keys to the doors of the federal courthouse. That's true of the court's

14

jurisdiction, and it is true when it comes to authorizing causes of action. *See* U.S. Const. art. I, § 8, cl. 9; U.S. Const. art. III, § 2; *see also Patchak v. Zinke*, 138 S. Ct. 897, 906 (2018) ("Congress' greater power to create lower federal courts includes the lesser power to 'limit the jurisdiction of those Courts.'") (citation omitted).

"When an issue involves a host of considerations that must be weighed and appraised, it should be committed to those who write the laws rather than those who interpret them. In most instances, the Court's precedents now instruct, the Legislature is in the better position to consider if the public interest would be served by imposing a new substantive legal liability." *See Abbasi*, 137 S. Ct. at 1857 (cleaned up).

"Outside of the particular factual scenario that gave rise to *Bivens*, the Court now cautions that the 'judicial task [is] limited solely to determining whether Congress intended to create the private right of action asserted.'" *Gustafson v. Thomas*, 451 F. Supp. 3d 892, 896 (N.D. Ill. 2020) (quoting *Abbasi*, 137 S. Ct. at 1856). "If the statute does not itself so provide, a private cause of action will not be created through judicial mandate." *Abbasi*, 137 S. Ct. at 1856.

*Bivens*, *Davis*, and *Carlson* remain good law, but the Supreme Court has made clear that extending *Bivens* is "disfavored." *Id.* at 1857; *see also Hernandez v. Mesa*, 140 S. Ct. 735, 755 (2020). When a party seeks to assert an implied cause of action under the Constitution, the ultimate "question is 'who should decide' whether to provide for a damages remedy, Congress or the courts?" *Abbasi*, 137 S. Ct. at 1857 (cleaned up). "The answer most often will be Congress." *Id.*

Courts engage in a two-step inquiry when asked to extend *Bivens*. First, courts ask whether the claim "arises in a 'new context' or involves a 'new category of defendants.'" *Hernandez*, 140 S. Ct. at 743 (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001)).

And a "new context" is broad.  *Id.*  A context is "new" if it is "different in a meaningful way from previous *Bivens* cases decided by [the] Court."  *Abbasi*, 137 S. Ct. at 1859.

The Supreme Court hasn't created an exhaustive list of differences to make a context a new one.  But it has provided examples.  "A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider."  *Id.* at 1859–60.

Second, when a claim arises in a new context, a district court asks whether any factors weigh in favor of hesitation.  *See Hernandez*, 140 S. Ct. at 743.  And if there are – "that is, if [the Court has] reason to pause before applying *Bivens* in a new context or to a new class of defendants – [the Court] reject[s] the request."  *Id.*

Separation-of-powers principles loom large, requiring caution, restraint, and deference to the political branches.  *See Abbasi*, 137 S. Ct. at 1856–59.  Courts must consider "the risk of interfering with the authority of the other branches, . . . whether 'there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy,' and 'whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed.'"  *Hernandez*, 140 S. Ct. at 743 (quoting *Abbasi*, 137 S. Ct. at 1858).  If any factor gives a "reason to pause" when considering whether to recognize a cause of action, the court should not extend *Bivens*.  *Id.*

Here, Zhang attempts to bring *Bivens* claims under the Fourth and Fifth Amendments against a federal law enforcement agent. She seeks to extend *Bivens* into new contexts, and special factors weigh against an extension. So the *Bivens* claims cannot go forward.

A. **Zhang's Fourth Amendment Claims Arise in New Contexts**

Zhang brings the first three claims against Schuster under the Fourth Amendment. She alleges false arrest (Count I), unlawful seizure of her money (Count II), and unlawful restrictions on her liberty through bond restrictions (Count III).

The first step is figuring out whether Zhang is attempting to apply *Bivens* to a new context. To that end, the Court compares Zhang's claims to the cases where the Supreme Court has authorized an implied cause of action. The closest analogue is *Bivens* itself.

In *Bivens*, agents from the Federal Bureau of Narcotics entered the plaintiff's apartment without a warrant, searched the place, and arrested him on narcotics charges without probable cause. *See Bivens*, 403 U.S. at 389. The agents manacled the plaintiff in front of his family, threatened to arrest the entire family, and "searched the apartment from stem to stern." *Id.* The agents then took the plaintiff to a federal courthouse where he was interrogated, booked, and subject to a visual strip search. *Id.* The plaintiff later sued, claiming unreasonable search and seizure under the Fourth Amendment. *Id.*

There are some similarities between *Bivens* and the case at hand – at a high level, anyway. Both cases involved the right to be free from unreasonable searches and seizures under the Fourth Amendment. But courts "do not define a *Bivens* cause of action at the level of 'the Fourth Amendment' or even at the level of 'the unreasonable-searches-and-seizures clause.'" *Cantú v. Moody*, 933 F.3d 414, 422 (5th Cir. 2019) (citing *FDIC v. Meyer*, 510 U.S. 471, 484 n.9 (1994)).

Instead, the Court must look at the contours of *Bivens* and compare it to the case at hand. That comparison reveals a number of meaningful differences.

First, Zhang is alleging a different type of Fourth Amendment claim than the one at issue in *Bivens*. At bottom, Zhang's claims are about the fabrication of evidence. She claims that Schuster lied about what took place inside the spa, and that his falsehood led to a cascade of events including false arrest and confiscation of her property.

*Bivens* did not involve the fabrication of evidence. *Bivens* involved the physical invasion of someone's home. In *Bivens*, six federal law enforcement agents forced their way into a home without a warrant and searched the premises. *See Bivens*, 403 U.S. at 389. The agents handcuffed Bivens in front of his wife and children and arrested him. *Id.* Later, the agents interrogated Bivens and subjected him to a visual strip search. *Id.*

Here, Zhang was arrested – and then her money seized, and liberty restricted – but not by Schuster. Agent Schuster entered Superb Spa, conducted his undercover operation, and reported to the officers what had happened. He didn't search Zhang or the spa. Nor did he arrest Zhang or seize any of her property. And even then, Zhang's arrest occurred at a business open to the public (unlike a private home in *Bivens*). The officers didn't search her *home*.

So, Zhang's Fourth Amendment claims against Schuster are not about Schuster invading her privacy interests at home. Her claims are really about Schuster lying as a fact witness.

A false statement is different than a physical invasion of someone's home, which is what took place in *Bivens*. *See Ahmed v. Weyker*, 984 F.3d 564, 568 (8th Cir. 2020); *Farah v. Weyker*, 926 F.3d 492, 499 (8th Cir. 2019); *Canada v. United States*, 950 F.3d 299, 307 (5th Cir. 2020). And claims that a federal officer lied or presented false evidence is different than a claim that a federal officer unlawfully physically searched and seized a person. *See Ahmed*, 984 F.3d at 568;

*Economan v. Cockrell*, 2020 WL 6874134, at \*24 (N.D. Ind. 2020) (finding that Fourth Amendment claims about a DEA agent and investigator presenting false evidence to seize a plaintiff's assets were "dramatically" different than *Bivens*); *Greenpoint Tactical Income Fund v. Pettigrew*, 2021 WL 461560, at \*14 (E.D. Wis. 2021) (finding that the alleged misrepresentation of information in affidavits to support search warrants to search and seize the plaintiff's homes, offices, and belongings meaningfully differed from *Bivens*).

Both the Fifth and Eighth Circuits have held that claims alleging that an officer duped others into believing that the plaintiff committed a crime presents a new *Bivens* context. *See Farah*, 926 F.3d at 499; *Cantú*, 933 F.3d at 422. Even though the constitutional right at issue is the same, the nature of the claims are different and the alleged misdeeds are different, so the context is different.

Second, Schuster played a different role than the officers in *Bivens*. Schuster was an undercover agent. He wore plain clothes during his interactions with Zhang. His task was to purchase a massage and see if Zhang talked about or arranged sexual contact or sex itself. And once he left the spa and reported his observations to the Batavia officers, he had no further involvement in the case. He did not arrest Zhang. And he did not seize her money. That role (an undercover agent) is meaningfully different than the role of the arresting officers who searched and seized in *Bivens*.

Something as small as the rank of the officers involved can make a context a new one. *See Abbasi*, 137 S. Ct. at 1860. And "information-gathering and case-building activities are a different part of police work than the apprehension, detention, and physical searches at issue in *Bivens*." *Farah*, 926 F.3d at 499; *see also Ahmed*, 984 F.3d at 569; *Economan*, 2020 WL 6874134, at \*25; *Annappareddy v. Pascale*, 996 F.3d 120, 136 (4th Cir. 2021).

Schuster played a different role than the officers in *Bivens*. And if the *rank* of the officer can make a context a new one, then surely the *role* of the officer can too. If anything, one would think that the role of the officer would be more important than the rank.

Essentially, Schuster was a witness to a crime. He provided the factual basis for the arrest by other officers. He did not personally arrest Zhang. In fact, Schuster wasn't even present when the arrest took place. Schuster didn't search or seize her property, either. And needless to say, Schuster never entered Zhang's home. Overall, there isn't much overlap between the claims in *Bivens* and the claims by Zhang, apart from the fact that they both involved the Fourth Amendment.

Third, *Bivens* and the case at hand involved different mechanisms of injury, meaning how the injury took place. *See Abbasi*, 137 S. Ct. at 1859. The plaintiff in *Bivens* objected to the seizure of his person, while Zhang objects to the seizure of her person and her cash and the loss of her liberty.

The mechanism of injury is different for Zhang's second and third claims. *Bivens* is about searching a person's home and seizing a person through arrest. *Bivens* did not involve the seizure of property, or a restriction of liberty through bond conditions. These differences create a new context for the second and third claims. But her first claim and *Bivens* have the same mechanism of injury: seizure through arrest.

Fourth, proving Zhang's claims requires a different type of showing than *Bivens*. Proving her claims would require fact-checking what the Batavia officers knew and when. Specifically, any examination of the initial arrest and subsequent seizures would require an examination into whether Schuster deliberately or recklessly made misstatements or omissions and whether the Batavia officers would have had probable cause to arrest Zhang in the absence

20

of Schuster's statement. But *Bivens* involved the actions of the arresting officers, not the actions of an officer who gave the arresting officers information.

Any claims against Schuster would go a step further than *Bivens* and require the probing and fact-checking of knowledge, coordination, and cooperation. Such probing was not involved in *Bivens*. *See Bivens*, 403 U.S. at 389; *see also Ahmed*, 984 F.3d at 569; *Williams v. City of Alexander*, 772 F.3d 1307, 1311 (8th Cir. 2014); *Green v. Nocciero*, 676 F.3d 748, 754–55 (8th Cir. 2012).

Ultimately, there several meaningful differences between *Bivens* and the case at hand. True, there are some high-level similarities, such as the shared reliance on the Fourth Amendment. But "a modest extension is still an extension," even if it involves "the same constitutional provision." *See Abbasi*, 137 S. Ct. at 1864; *Hernandez*, 140 S. Ct. at 743. As a result, Zhang's Fourth Amendment claims involve new contexts.

### B. Zhang's Fifth Amendment Claim Arises in a New Context

Zhang also alleges a Fifth Amendment claim against Schuster. Zhang alleges that Schuster violated her Fifth Amendment rights by "causing a false report and a false criminal complaint to be created and transmitted to prosecutors." *See* Fourth Am. Cplt., at ¶ 47 (Dckt. No. 121). This is a fabrication of evidence claim. But this claim doesn't match any of the contexts recognized in *Bivens*, *Davis*, or *Carlson*, or any of the contexts recognized by the Seventh Circuit.

*Davis*, while a Fifth Amendment claim, fell under the equal protection component of the Fifth Amendment (meaning the reverse incorporation of the Equal Protection Clause through the Due Process Clause of the Fifth Amendment, so that it applies to federal agents). *See Davis*, 442 U.S. at 234–44. Zhang's claim, in contrast, is about due process.

21

To be sure, the Seventh Circuit *has* recognized a Fifth Amendment *Bivens* action involving due process, but it involved a *Brady* violation. *See Engel v. Buchan*, 710 F.3d 698 (7th Cir. 2013). The plaintiff in *Engel* alleged that a federal agent framed the plaintiff by fabricating evidence and manipulating witnesses.

The Seventh Circuit decided *Engel* before the Supreme Court handed down *Abbasi*, which tightened the screws on the *Bivens* framework. *See White v. Sloop*, 772 F. App'x 334, 335 (7th Cir. 2019) ("But, since *Abbasi*, the *Bivens* framework has narrowed substantially to limit lawsuits against federal agents; this court's 'past pronouncements are thus not controlling.'") (quoting *Vanderklok v. United States*, 868 F.3d 189, 199 (3d Cir. 2017)). And the plaintiff in *Engel* was convicted and spent nearly a decade in prison before his conviction was vacated. *See Engel*, 710 F.3d at 700.

Zhang had a much different experience with the criminal justice system. She never faced trial. The state dropped her charge, so there was no trial, let alone a *Brady* violation. There was no conviction, no sentence, and no punishment. Zhang's claim is about the beginning of the criminal process – the charges – not the end.

And after *Abbasi*, the Fourth, Fifth, and Eighth Circuits have expressly rejected Fifth Amendment claims like Zhang's claim. *See Annappareddy*, 996 F.3d at 137 (declining to recognize a cause of action for fabrication of evidence under *Bivens*); *Cantú*, 933 F.3d at 421 (same), *cert. denied*, 141 S. Ct. 112 (2020); *Farah*, 926 F.3d at 502 (same); *see also Selvam v. United States*, 2021 WL 5149809 (E.D.N.Y. 2021).

Zhang's claim is different than *Davis* and *Engels*, so it also arises in a new context.

### C. Special Factors Counsel Against Extension

Zhang's Fourth and Fifth Amendment claims arise in new contexts, so the Court must ask whether any special factors push against an extension of *Bivens*. And here, several factors weigh against extending *Bivens*.

First, Zhang had other avenues for pursuing a remedy, and "that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action." *See Abbasi*, 137 S. Ct. at 1858. The Federal Tort Claims Act permits claims "arising out of . . . false arrest, malicious prosecution, [and] abuse of process" due to "acts or omissions of investigative or law enforcement officers of the United States Government" as long as the conduct was not "based upon the exercise or performance or the failure to exercise or perform a discretionary function." *See* 28 U.S.C. § 2680(a), (h).

The FTCA alone does not displace an otherwise appropriate *Bivens* action, but the availability of relief under both the FTCA and state tort law may provide "alternative means for relief." *See Carlson*, 446 U.S. at 23; *Malesko*, 534 U.S. at 73–74. And since *Abbasi*, many courts have found that even the potential availability of relief under the FTCA weighs against permitting a *Bivens* remedy. *See, e.g.*, *Cantú*, 933 F.3d at 423; *Oliveras v. Basile*, 440 F. Supp. 3d 365, 373 (S.D.N.Y. 2020); *Greenpoint Tactical Income Fund*, 2021 WL 461560, at *13; *Martin v. Gray*, 2021 WL 3855566, at *5 (E.D. Wis. 2021).

For Zhang's seizure of property claim (Count II), the Illinois Money Laundering Act, 725 ILCS 5/29B, also provides a remedial scheme for individuals seeking the return of unlawfully seized property.[1] Officers seized Zhang's money, and she eventually forfeited it, under

---

[1] Defendant Schuster argues that the Illinois Drug Asset Forfeiture Procedure Act provides a remedial scheme for Count II, but he is mistaken. The Notice/Inventory of Seized Property for Zhang's $6,000 states that the State's Attorney was initiating forfeiture proceedings under the Money Laundering Article, *not* the Drug Asset Forfeiture Procedure Act. *See* Notice/Inventory of Seized Property (Dckt. No. 211, at

provisions of the Money Laundering Article.  *See* Notice/Inventory of Seized Property (Dckt. No. 211, at 12 of 20).  The Article provides a procedure for a person claiming an interest in the property to express their interest, converting the proceeding into an *in rem* forfeiture proceeding.  *See* 720 ILCS 5/29B-12.  And if the property is returned, the Act provides that the law enforcement agency that holds custody of the property "is responsible for any damages, storage fees, and related costs applicable to property returned."  *See* 720 ILCS 5/29B-25(b).

Zhang was not kept in the dark about this opportunity for relief.  In fact, the Kane County State's Attorney told Zhang all about it.  In the Notice of Pending Forfeiture, the Kane County State's Attorney explained how an interest holder in property can file a verified claim for the return of the property.[2]  *See* Notice of Pending Forfeiture (Dckt. No. 211, at 6 of 20).

And for Zhang's claim about her bond conditions (Count III), Zhang had another avenue for seeking relief:  asking the state court to change her bond conditions.  Her bond conditions restricted her ability to leave the state, unless she received the go-ahead from the court.  *See* Def. Schuster's Statement of Facts, at ¶ 44 (Dckt. No. 203).  There is no need for a *Bivens* claim to give Zhang a chance to challenge her bond conditions, because she could have asked the state court to revise her bond conditions.

In sum, Zhang had the opportunity to pursue other remedial schemes for relief.  They may not provide identical relief to that of a *Bivens* claim, but identical relief isn't required.  The issue isn't whether Congress established an actual *remedy* for an individual plaintiff, but whether

---

12 of 20).  While Schuster is mistaken on the law, he is correct that there is a remedial structure for Count II.

[2]  The statute cited in the notice is the Illinois Drug Asset Forfeiture Procedure Act, but the Money Laundering Article provides the exact same procedure.  *Compare* 725 ILCS 150/6(C)(1), *with* 720 ILCS 5/29B-12(3)(A).

there is an alternative remedial *structure* for addressing the issue. *See Williams v. Keller*, 2021 WL 4486392, at *3 (10th Cir. 2021).

A second special factor is the nature of the underlying federal law enforcement activity. An implied cause of action for Zhang's claims would "require courts to interfere in the executive branch's investigative and prosecutorial functions." *See Annappareddy*, 996 F.3d at 137.

Zhang's claims arise from a cooperative investigation between Homeland Security and the Batavia Police Department. The operation involved both federal agents (like Schuster) and local police (like Sergeant Mazza and Detective Bretz). While the local police were interested in investigating citizens' complaints about Superb Spa specifically, the federal agents focused on human trafficking more broadly. An action arising from such an investigation intrudes more deeply into the Executive Branch than a cause of action pertaining to a single warrantless search and seizure by narcotics officers like *Bivens*. *See Selvam*, 2021 WL 5149809, at *7 (declining to extend *Bivens* to a Fifth Amendment claim arising from a complex, multi-agency federal investigation with international components); *Annappareddy*, 996 F.3d at 137–38 (indicating hesitation about extending *Bivens* to fabrication allegations that arose out of "a complex and multi-agency investigation" spanning several states); *Cantú*, 933 F.3d at 424 (indicating hesitation about extending *Bivens* into fabrication allegations arising out of "a multi-jurisdictional investigation into transnational organized crime"). While the cooperative operation was limited in scope and cooperation, Zhang's claims ultimately involve what officers knew and when they knew it. So an inquiry into whether the officers had probable cause or Agent Schuster lied implicates separation-of-powers considerations because it would require "a wide-ranging dive into . . . all evidence available to investigators . . . ." *See Annappareddy*, 996 F.3d at 138 (citation omitted); *see also Farah*, 926 F.3d at 500.

The third special factor is the length of time that Congress has gone without statutorily creating a *Bivens*-type remedy for this context. "Because Congress has long been on notice that the Supreme Court is disinclined to extend *Bivens* to new contexts, its 'failure to provide a damages remedy' here suggests 'more than mere oversight.'" *Cantú*, 933 F.3d at 423 (citing *Abbasi*, 137 S. Ct. at 1857). Congress knows what it's doing, and what it's *not* doing.

In sum, several factors weigh heavily against recognizing a cause of action. In the end, creating a damages claim against individual federal officers "is a decision for Congress to make, not the courts." *See Abbasi*, 137 S. Ct. at 1860. So this Court declines the invitation to extend *Bivens* to cover Zhang's claims.

### D. Lack of Constitutional Violations

Even if Zhang had a *Bivens* remedy and could pursue her claims against Schuster, he would be entitled to summary judgment for at least three of Zhang's claims. Zhang cannot prove constitutional violations for Count II (unlawful seizure of the cash), Count III (pretrial seizure of Zhang personally), and Count IV (fabrication of evidence under the Due Process Clause).

A *Bivens* defendant can only be held "liable for his or her own misconduct." *See Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). So there needs to be a causal connection between the defendant's conduct and the plaintiff's injury. *Cf. Hartman v. Moore*, 547 U.S. 250, 259 (2006).

Zhang's second claim is that Schuster and the Batavia Defendants unconstitutionally seized over $6,000 from her. It's true that Schuster's conduct set off the chain of events resulting in the seizure. But there were intervening events, breaking the causal chain, between Schuster's conduct and the seizure. He didn't seize her money.

Schuster's involvement ended when he exited the spa and told the officers what had happened.[3]  At that point, Zhang hadn't been arrested.  Later, at the end of the booking process, she asked for her purse, which prompted the search that led to the discovery of the money.

Schuster witnessed the alleged misconduct, but did not participate in the law enforcement actions that followed.  He didn't place her under arrest, or take her to the police station, or search her purse, or seize her money.  The Batavia Police Department took all of those actions. Schuster can't be liable for the actions of someone else, so Zhang cannot prove a constitutional violation for Count II.

And, as discussed below, Zhang cannot prove a constitutional violation for Counts III and IV either.  Standard bond conditions (Count III) are not seizures.  *See Smith v. City of Chicago*, 3 F.4th 332, 340 (7th Cir. 2021) ("We now conclude that the standard bond conditions that Smith experienced did not constitute a continuing seizure.").  And any claim about her pretrial detention (Count IV) would arise under the Fourth Amendment, so a Due Process Clause claim about wrongful pretrial detention cannot survive.  *See Lewis v. City of Chicago*, 914 F.3d 472, 478 (7th Cir. 2019).

In sum, this Court will not extend *Bivens* to reach Zhang's claims.  Even if *Bivens* applied, Zhang would have no claim for the seizure of her cash (Count II), the pretrial restriction on liberty (Count III), and the fabrication of evidence (Count IV).  This Court grants Defendant Schuster's motion for summary judgment.

---

[3]  Or as Zhang tells it, his involvement ended when he was still inside the spa, while she was arrested. *See* Def. Schuster's Statement of Facts, at ¶ 3 (Dckt. No. 203).  It ultimately doesn't matter which version is true because Zhang does not dispute that Schuster did not arrest her and wasn't involved at the police station.

**II.     Section 1983**

In addition to Zhang's *Bivens* claims against Schuster (a federal agent), Zhang brings four claims against Sergeant Mazza and Detective Bretz (state agents) under 42 U.S.C § 1983.  To succeed on a section 1983 claim, Zhang must prove "(1) the deprivation of a right secured by the Constitution or federal law and (2) that defendants were acting under color of state law."  *Wilson v. Warren County*, 830 F.3d 464, 468 (7th Cir. 2016).  Again, Zhang cannot bring a section 1983 claim against Schuster because he acted under federal law, not state law.  *See Abbasi*, 137 S. Ct. at 1854.

Zhang brings four claims under section 1983:  (1) false arrest; (2) unlawful seizure of property; (3) unlawful bond conditions; and (4) wrongful pretrial detention.

**A.     False Arrest (Claim I)**

The first claim is about Zhang's arrest.  Zhang claims that Mazza and Bretz violated her Fourth Amendment rights by arresting her without probable cause.  *See* Fourth Am. Cplt., at ¶¶ 25–29 (Dckt. No. 121).  The Batavia Defendants argue that the record shows probable cause to arrest Zhang.  They also contend that qualified immunity applies.

The Court agrees that Zhang has no claim.

**1.     Probable Cause**

The Fourth Amendment protects the "right of the people to be secure in their persons . . . against unreasonable searches and seizures . . . ."  *See* U.S. Const. amend. IV.  A warrantless arrest requires probable cause to be reasonable.  *See Gutierrez v. Kermon*, 722 F.3d 1003, 1007 (7th Cir. 2013).  On the flipside, the existence of probable cause is an absolute defense to a section 1983 claim for false arrest.  *Id.*; *Abbott v. Sangamon County*, 705 F.3d 706, 713–14 (7th Cir. 2013); *see also Neita v. City of Chicago*, 830 F.3d 494, 497 (7th Cir. 2016).

"Probable cause to justify an arrest exists if the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Abbott*, 705 F.3d at 714; *see also Thayer v. Chiczewski*, 705 F.3d 237, 246 (7th Cir. 2012); *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979); *Beck v. Ohio*, 379 U.S. 89, 91 (1964). Probable cause deals with probabilities, not hard certainties. *See Abbott*, 705 F.3d at 714. While probable cause requires more than a hunch, it does not require a finding that it was more likely than not that the arrestee was engaged in criminal activity. *Id.*

In fact, "[t]he complaint of a single witness or putative victim alone generally is sufficient to establish probable cause to arrest unless the complaint would lead a reasonable officer to be suspicious, in which case the officer has a further duty to investigate." *Beauchamp v. City of Noblesville*, 320 F.3d 733, 743 (7th Cir. 2003) (collecting cases). And that witness or victim can be a fellow officer. *See, e.g.*, *Arlotta v. Ruege*, 2006 WL 3827479 (E.D. Wis. 2006).

The witness can even turn out to be wrong. "Probable cause does not depend on the witness turning out to have been right; it's what the police know, not whether they know the truth, that matters." *Sow v. Fortville Police Dep't*, 636 F.3d 293, 302 (7th Cir. 2011).

The probable cause inquiry is an objective one. The officer's "subjective state of mind and beliefs are irrelevant." *Abbott*, 705 F.3d at 714 (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)). The Court must look to the officer's knowledge at the time and determine whether those facts and circumstances created probable cause for an arrest, viewed from the standpoint of an "objectively reasonable police officer." *Id.* (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). Probable cause "'depends not on the facts as an omniscient observer would perceive them but on the facts as they would have appeared to a reasonable person in the position of the

29

arresting officer – seeing what he saw, hearing what he heard.'" *Carmichael v. Village of Palatine*, 605 F.3d 451, 457 (7th Cir. 2010) (quoting *Mahoney v. Kesery*, 976 F.2d 1054, 1057 (7th Cir. 1992)) (emphasis omitted).

"Usually in a § 1983 false-arrest case the jury determines whether the arrest was supported by probable cause; but if the underlying facts are undisputed, the court can make that decision on summary judgment." *See Abbott*, 705 F.3d at 714. Here, the material facts are undisputed.

The officers had probable cause for the arrest. Before the undercover operation, the Batavia officers received multiple complaints from the community about suspected prostitution at Superb Spa. *See* Batavia Defs.' Statement of Facts, at ¶¶ 8–11 (Dckt. No. 197). Those complaints included links and copies of advertisements on websites known to advertise prostitution for a spa at Superb Spa's address. *Id.* at ¶ 11. And at the end of the sting operation, Schuster told the officers that Zhang had touched him in a sexual manner after he gestured towards his groin and offered money. *Id.* at ¶ 22.

Based on the statements of the undercover agent, and other indicia of ongoing prostitution at the spa, the police officers had probable cause to believe that Zhang had committed a crime. No reasonable jury could find otherwise.

The record lacks any evidence that would suggest that Schuster was not credible or that the officers should doubt his accounts. Schuster is an experienced undercover agent. There is nothing to suggest that the Batavia Defendants doubted, or had reason to doubt, his credibility.

At deposition, Zhang did give a different version of what took place inside the spa. *See* Batavia Defs.' Statement of Facts, at ¶ 25 (Dckt. No. 197). But even if her version is correct –

that is, even if she behaved appropriately, and Schuster made up the whole thing – Zhang would not have a false arrest claim.

The question is not what took place inside the spa. The witness didn't have to be *correct*. The question is whether the police officers had probable cause to arrest her. And here, they did. They heard a statement from a federal law enforcement agent that Zhang had acted in a manner consistent with prostitution. Based on the statement from Schuster, and other surrounding circumstances, there was probable cause for the arrest.

### 2. Qualified Immunity

Even if the officers did not have probable cause, Zhang would have no viable claim. The officers would receive the protection of qualified immunity.

"Qualified immunity shields a government official from suit when the official is performing a discretionary function and his conduct does not violate clearly established rights of which a reasonable person would have known." *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 572 (7th Cir. 2014). Qualified immunity gives officers the benefit of the doubt when they make decisions without crossing well-established boundaries. "'Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.'" *Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004) (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)).

"Once an officer asserts qualified immunity, a plaintiff can proceed with his case only if he can show (1) that the 'facts, taken in the light most favorable to [him], make out a violation of a constitutional right,' and (2) that right was 'clearly established at the time of the alleged violation.'" *Koh v. Ustich*, 933 F.3d 836, 844 (7th Cir. 2019) (quoting *Gill v. City of Milwaukee*, 850 F.3d 335, 340 (7th Cir. 2017)). "'If either inquiry is answered in the negative, the defendant

official' is protected by qualified immunity." *Id.* (quoting *Reed v. Palmer*, 906 F.3d 540, 546 (7th Cir. 2018)) (emphasis omitted).

"[A] defendant is entitled to qualified immunity in a false-arrest case when, even if there is no probable cause, 'a reasonable officer could have mistakenly believed that probable cause existed.'" *Cibulka v. City of Madison*, 992 F.3d 633, 638 (7th Cir. 2021). "[A]s long as [the officers] reasonably, albeit possibly mistakenly, believed that probable cause existed to arrest [Zhang], then [they are] entitled to qualified immunity." *Id.* (cleaned up); *see also Duran v. Sirgedas*, 240 F. App'x 104, 115 (7th Cir. 2007) ("[W]here a police officer makes an arrest on the basis of oral statements by fellow officers, an officer will be entitled to qualified immunity from liability in a civil rights suit for unlawful arrest provided it was objectively reasonable for him to believe, on the basis of the statements, that probable cause for the arrest existed.") (citation omitted). This is the "arguable probable cause" standard.

Under the circumstances of this case, it was objectively reasonable for the Batavia Defendants to rely on Schuster's statement as a basis for believing that probable cause existed to arrest Zhang. They were conducting an undercover operation and Schuster had just left a massage with Zhang. The Batavia Defendants were outside waiting to hear what happened. They acted on information of a witness and the officers had no reason (at least on this record) to doubt Schuster's credibility.

Even if the officers didn't have probable cause, they had arguable probable cause. It would be objectively reasonable for the officers to think that Schuster's statement alone established probable cause. From the Batavia Defendants' perspective, Schuster – an undercover agent with a federal law enforcement agency – is a reliable witness. So, under the arguable probable cause standard, the Batavia Defendants are entitled to qualified immunity.

Since the arresting officers possessed probable cause, or at the very least arguable probable cause, at the time of Zhang's arrest, the Batavia Defendants are entitled to summary judgment on Count I.

### B. Unlawful Seizure (Claim II)

Zhang's second claim is about the seizure of cash from her purse at the police station. Zhang claims that Mazza and Bretz unconstitutionally seized, or caused to be seized, over $6,000 in cash from her purse in violation of the Fourth Amendment.

The Batavia Defendants argue that there was probable cause to seize the cash. They also contend that qualified immunity applies. The Court agrees.

#### 1. Probable Cause

The Fourth Amendment also protects a person's papers and effects against unreasonable searches and seizures. *See* U.S. Const. amend. IV. Here, the officers searched Zhang's purse and seized over $6,000 in cash found inside. So, the constitutionality of the seizure also depends on the constitutionality of the search.

Warrantless searches are "per se unreasonable under the Fourth Amendment unless they fall within 'a few specifically established and well-delineated exceptions.'" *United States v. Charles*, 801 F.3d 855, 860 (7th Cir. 2015) (quoting *Arizona v. Gant*, 556 U.S. 332, 338 (2009)). And one category of searches that are reasonable are searches incident to arrest.

"A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification." *Campbell v. Miller*, 499 F.3d 711, 716–17 (7th Cir. 2007).

A valid search incident to arrest is not limited to a search immediately after arrest. *See, e.g.*, *United States v. Jeffers*, 524 F.2d 253, 255 (7th Cir. 1975) (finding the search of a purse

during processing, shortly after arrest, permissible); *United States v. Edwards*, 415 U.S. 800, 803 (1974) ("[S]earches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention."). "Because proper processing of arrestees is so important and has consequences for every stage of the criminal process, the Court has recognized that the 'governmental interests underlying a station-house search of the arrestee's person and possessions may in some circumstances be even greater than those supporting a search immediately following arrest.'" *Maryland v. King*, 569 U.S. 435, 456 (2013) (quoting *Illinois v. Lafayette*, 462 U.S. 640, 645 (1983)).

*Jeffers* is particularly instructive. The defendant was arrested in her home. *See Jeffers*, 524 F.2d at 254. While she was getting ready to leave, one of the arresting officers made a cursory search of a nearby purse for weapons. *Id.* The defendant then took the purse with her to the federal building. *Id.* Later, during processing, the defendant asked an officer to get her nerve pills within the purse. *Id.* The officer retrieved the purse but didn't find any nerve pills. *Id.* Instead, the officer searched the purse and found a small note, which inside had heroin. *Id.* The defendant challenged the search of the purse and seizure of the heroin. *Id.*

The Seventh Circuit held that the search and seizure were proper. *Id.* Specifically, the Seventh Circuit focused on the fact that the search occurred during the processing of the petitioner, at the place of detention, and only shortly after her arrest. *Id.* at 255 (citing *United States v. Edwards*, 411 U.S. 800, 802–04 (1974)). And the Seventh Circuit held that it didn't matter that the search was not motivated by a feeling of imminent danger. *Id.* (citing *Untied States v. Robinson*, 414 U.S. 218, 236 n.7 (1973)). She was still being processed after arrest.

Here, Zhang requested her purse at the police station. *See* Def. Schuster's Statement of Facts, at ¶ 47 (Dckt. No. 197). It doesn't matter that the search occurred a few hours after her

arrest, or that it happened at the stationhouse. *See Edwards*, 411 U.S. at 803. The officers had probable cause to arrest Zhang, so they could conduct a search incident to arrest. The search incident to arrest necessarily includes property taken to the police station for the booking.

Once the officers searched the purse, they found over $6,000 in cash. *See* Def. Schuster's Statement of Facts, at ¶ 47 (Dckt. No. 203). The officers then seized that cash after calling the Kane County State's Attorney's hotline and talking to an on-call assistant state's attorney. *Id.* at ¶ 49; Batavia Defs.' Statement of Facts, at ¶¶ 38–39 (Dckt. No. 197).

"The plain view doctrine authorizes a warrantless seizure if first, the law enforcement officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed; second, the item was in plain view; and third, its incriminating character was immediately apparent." *United States v. Cherry*, 920 F.3d 1126, 1137–38 (7th Cir. 2016). The plain-view doctrine does not authorize police to seize an innocent object in plain view to see whether it might be a guilty object. *See Arizona v. Hicks*, 480 U.S. 321, 326–28 (1987). But the requirement that the evidence's incriminating character be immediately apparent does not mean that the criminal nature of the items seized must be apparent at first glance. *See Texas v. Brown*, 460 U.S. 730, 741 (1983). Rather, the officers must have "probable cause to associate the property with criminal activity." *Id.* at 741–42.

Money isn't always suspicious. *See United States v. Moreland*, 703 F.3d 976, 987–88 (7th Cir. 2012) ("Law-abiding people sometimes carry large amounts of cash on their person; this is thought to be common enough to require evidence connecting the cash to a crime to establish probable cause for seizing the cash."). But depending on the situation, a thick wad of cash can give rise to probable cause, specifically, when it is in the hands of a person who the police have good reason to believe was committing a cash-based crime. *See United States v.*

*Hernandez-Rivas*, 348 F.3d 595, 599 (7th Cir. 2003) ("During the course of the pat-down the deputies seized $10,000 cash from Hernandez–Rivas['s] breast pocket and a false identification card and $1,000 from his wallet. The $10,000 in his breast pocket was visible to the deputy, and the deputy had reason to believe that the money was proceeds of the drug trafficking."). It all depends on the facts.

Here, the police had probable cause to conclude that the cash was connected to criminal wrongdoing. The police investigated the massage parlor after hearing repeated complaints from the community about possible prostitution. An undercover agent told the police that Zhang had engaged in illicit activity. And critically, that activity was connected to an offer of cash, as prostitution often is. (Presumably, people don't pay for prostitution by check or credit card.) All together, those facts support a connection between the stash of cash and the alleged crime.

So the officers' search of the purse and seizure of the cash were proper.

### 2.      Qualified Immunity

But once again, even if the officers' seizure of the cash was improper, the Batavia Defendants are entitled to qualified immunity.

Consulting with prosecutors about the legal requirements for searching or seizing "goes a long way toward solidifying [a] qualified immunity defense." *Fleming v. Livingston County*, 674 F.3d 874, 881 (7th Cir. 2012) (addressing a false arrest claim); *see also Messerschmidt v. Millender*, 565 U.S. 535, 554 (2012) (finding that an officer's consultation with deputy district attorney "provides further support for the conclusion that an officer could reasonably have believed that the scope for the warrant was supported by probable cause"); *Burritt v. Ditlefsen*, 807 F.3d 239, 251 (7th Cir. 2015) (finding that an officer's qualified immunity defense was "[f]urther bolster[ed]" by the fact that she consulted with district attorney before conducting

36

arrest); *Money Market Pawn, Inc. v. Wirth*, 32 F. Supp. 3d 903, 909 (N.D. Ill. 2014) (finding that officers were entitled to qualified immunity on a due process claim based on a seizure after consulting with a prosecutor); *Mitan v. Clark*, 2021 WL 4223263, at *6 (S.D. Ind. 2021). "Otherwise the incentive for officers to consult prosecutors . . . would be greatly diminished." *Kijonka v. Seitzinger*, 363 F.3d 645, 648 (7th Cir. 2004) (citation omitted).

Often officers consult with prosecutors before arrest, but sometimes they also consult prosecutors before seizing evidence. *See Money Market Pawn, Inc.*, 32 F. Supp. 3d at 909; *Mitan*, 2021 WL 4223263 at *6. While consulting a prosecutor alone does not establish qualified immunity, it goes a long way to establishing arguable probable cause and qualified immunity. *See Fleming*, 674 F.3d at 881.

Detective Bretz called the Kane County State's Attorney before seizing the cash. So not only did Detective Bretz discover the cash right after arresting Zhang for prostitution in an undercover operation where the agent paid in cash, he also consulted the State's Attorney about whether he could legally seize the cash. And the State's Attorney advised that he could seize the money as evidence of a crime. Together, these facts establish arguable probable cause (if not actual probable cause).

As a result, the officers are entitled to qualified immunity.

### C. Pretrial Liberty Restriction (Claim III)

Zhang's third claim is about her bond restrictions. The state court placed seven restrictions on her before releasing her on bond. *See* Def. Schuster's Statement of Facts, at ¶ 44 (Dckt. No. 203). Zhang claims that these restrictions – namely, two restrictions preventing Zhang from leaving Illinois – restricted her liberty and amounted to an unconstitutional post-arrest pretrial seizure without probable cause. *See* Fourth Am. Cplt., at ¶¶ 35–44 (Dckt.

No. 121). As a result, Zhang claims that Mazza and Bretz violated her Fourth Amendment rights. *Id.*

But standard bond conditions, like those that Zhang experienced, do not constitute a seizure. In fact, the Seventh Circuit recently confirmed that run-of-the-mill bond conditions – like a restriction on leaving the state – do not count as a seizure. *See Smith v. City of Chicago*, 3 F.4th 332, 340 (7th Cir. 2021).

A seizure of a person "can take the form of 'physical force' or a 'show of authority' that 'in some way restrain[s] the liberty' of the person." *Torres v. Madrid*, 141 S. Ct. 989, 995 (2021) (citation omitted). "If physical force is applied, an individual need not actually be brought under the government's control to be seized, whereas when a seizure is accomplished by a show of authority, submission is required." *Smith*, 3 F.4th at 340 (citing *Torres*, 141 S. Ct. at 1001). "In either situation, the seizure is a specific event, and 'we have repeatedly rejected the concept of continuing seizure.'" *Id.* (quoting *Welton v. Anderson*, 770 F.3d 670, 675 (7th Cir. 2014)) (quotation marks omitted).

Zhang argues that her bond conditions involve a show of authority. She says that she was seized when the bond conditions required her to travel to six court hearings and not leave Illinois, despite wanting to return to China. *See* Fourth Am. Cplt., at ¶¶ 39–42 (Dckt. No. 121). Her argument is misplaced.

Not every restriction on the liberty of a pretrial detainee is a seizure. Two Seventh Circuit Opinions are instructive.

In *Bielanski v. City of Kane*, 550 F.3d 632 (7th Cir. 2008), the Seventh Circuit ruled that an individual was not seized within the meaning of the Fourth Amendment when she was required to appear in court, request permission before leaving the state, and meet with an officer

38

once a week. *Bielanski*, 550 F.3d at 642. The Seventh Circuit concluded that the obligation to appear in court, on its own, could not constitute a seizure because "to hold otherwise would transform every traffic ticket and jury summons into a potential Section 1983 claim." *Id.* at 642; *see also Mitchell v. City of Elgin*, 912 F.3d 1012, 1017 (7th Cir. 2019) ("We have misgivings about construing a simple obligation to appear in court – a uniform condition of any pretrial release – as a seizure for Fourth Amendment purposes.") (quotation marks omitted). And the Seventh Circuit viewed travel restrictions as "a precursor to a possible seizure rather than a seizure itself" because the plaintiff had not shown that she had ever been denied permission to travel. *See Bielanski*, 550 F.3d at 642.

But *Bielanski*, while instructive, did not concern bond requirements. The Seventh Circuit did squarely address bond requirements in *Smith v. City of Chicago*, 3 F.4th 332 (7th Cir. 2021). There, the Seventh Circuit commented that they were "generally skeptical that standard bond conditions may constitute a Fourth Amendment seizure." *Id.* at 341.

The Court of Appeals went on to say that "[r]equirements to appear in court and to request permission before leaving the state [] do not fit within the historical and judicially recognized framework of what constitutes a seizure." *Id.* (citing *Nieves v. McSweeney*, 241 F.3d 46, 54–55 (1st Cir. 2001)). "The [requirement to appear in court] is not a present show of authority but a future obligation to do something; it lacks the immediacy of a Fourth Amendment seizure." *Id.* "Even if the mandate to appear in court could be considered a show of authority, a person would still need to appear there to submit to that authority; so that requirement cannot constitute a seizure, much less an ongoing one." *Id.*

If a duty to attend a hearing is a seizure, then compulsory conduct like jury duty and traffic hearings could be considered a seizure, too. *See Mitchell*, 912 F.3d at 1017. And "[a]s to

a condition that a defendant request permission before traveling, the court in *Bielanski* properly considered this a 'precursor to a possible seizure but not a seizure itself.'" *Smith*, 3 F.4th at 341 (quoting *Bielanski*, 550 F.3d at 642). Ultimately, there is no restriction on the defendant's freedom of movement unless he is denied permission to leave. *Id.*

While the *Smith* court did adopt a case-by-case approach (and did not foreclose the possibility that a bond condition might constitute a Fourth Amendment claim), the bond conditions that the *Smith* court considered are the exact bond conditions challenged here. *Id.* So, the requirement that Zhang appear in court is not a seizure. *See Smith*, 3 F. 4th at 341. And the requirement to not leave Illinois is also not a seizure unless permission to leave is denied. *Id.*; *Bielanski*, 550 F.3d at 642. Zhang never requested to leave, let alone had that permission denied. *See* Batavia Defs.' Statement of Facts, at ¶ 42 (Dckt. No. 197); Def. Schuster's Statement of Facts, at ¶ 46 (Dckt. No. 203).

Zhang's bond conditions cannot constitute a seizure within the meaning of the Fourth Amendment. She cannot prove a Fourth Amendment violation, so summary judgment is granted on Count III.

### D.     Due Process (Claim IV)

Zhang's fourth claim is about due process. Zhang claims that Mazza and Bretz violated her due process rights by fabricating a false report and a false criminal complaint, and sending them to prosecutors. *See* Fourth Am. Cplt., at ¶¶ 45–49 (Dckt. No. 121). She alleges that the state used these false documents to secure her prosecution and deprive her of liberty through pretrial detention. *Id.* But as Zhang admits in her Fourth Amended Complaint, current Seventh Circuit case law forecloses this claim. *Id.* at Count IV n.1.

"There is no such thing as a constitutional right not to be prosecuted without probable cause." *Manuel v. City of Joliet*, 903 F.3d 667, 670 (7th Cir. 2017). And any claim for wrongful pretrial detention – whether based on fabricated evidence or some other defect – must arise under the Fourth Amendment, not the Due Process Clause. *See Lewis v. City of Chicago*, 914 F.3d 472, 478 (7th Cir. 2019).

In *Lewis*, the plaintiff argued that "misconduct by law enforcement – falsifying the police reports that led to his pretrial detention – . . . violated his right to due process." *Id.* But the Seventh Circuit rejected that claim, explaining that the Fourth Amendment, not the Due Process Clause, governs a claim for wrongful pretrial detention. *Id.* at 479; *see also Manuel v. City of Joliet*, 137 S. Ct. 911, 920 (2017); *Manuel*, 903 F.3d at 670.

Zhang contends, as other plaintiffs have, that *Lewis* is no longer good law. She says that *McDonough v. Smith*, 139 S. Ct. 2149, 2155 (2019), implicitly acknowledged such a due process claim. In *McDonough*, the Supreme Court, in addressing the question of claim accrual, "assume[d] without deciding" that the Second Circuit had appropriately framed that claim as arising under the Due Process Clause. *See McDonough*, 139 S. Ct. 2149 at 2155.

But this Court is bound by Seventh Circuit precedent, unless and until the Seventh Circuit or the Supreme Court says otherwise. *See Liggins v. City of Chicago*, 2021 WL 2894167, at *3–4 (N.D. Ill. 2021); *Cruz v. City of Chicago*, 2021 WL 2645558, at *9–10 (N.D. Ill. 2021); *Grayer v. City of Chicago*, 2021 WL 2433661, at *3 (N.D. Ill. 2021); *Mack v. City of Chicago*, 2020 WL 7027649, at *3 (N.D. Ill. 2020); *Henderson v. Rangel*, 2020 WL 5652943, at *3 (N.D. Ill. 2020). And even after *McDonough*, the Seventh Circuit continues to apply *Lewis*, so this Court will too. *See, e.g.*, *Camm v. Faith*, 937 F.3d 1096, 1105 (7th Cir. 2019) (noting the complaint "cited both the Fourth and Fourteenth Amendments, but properly construed, the malicious-prosecution claim

is really one for wrongful arrest and detention in violation of the Fourth Amendment"); *Kuri v. City of Chicago*, 990 F.3d 573, 575 (7th Cir. 2021) ("If the detention is not supported by probable cause, however, the Fourth Amendment provides a remedy."); *Young v. City of Chicago*, 987 F.3d 641 (7th Cir. 2021).

And even if Zhang could maintain a due process claim, Defendants would still be entitled to summary judgment. A due process claim requires a loss of liberty. *See Cairel v. Alderden*, 821 F.3d 823, 831 (7th Cir. 2016). But the Seventh Circuit has said that a plaintiff who is quickly released on bond after an arrest, and never actually tried, cannot maintain a due process claim for fabrication of evidence. *Id.* Zhang fits that mold. She was arrested, released on bond that same day, and never tried.

Defendants are entitled to summary judgment on Count IV.

## III. Malicious Prosecution (Claim V)

Zhang also brings a state law claim of malicious prosecution against Sergeant Mazza, Detective Bretz, and the City of Batavia. Defendants argue that Zhang cannot prove the elements of a claim.

To prove malicious prosecution under Illinois law, Zhang must establish: "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." *See Beaman v. Fressmeyer*, 2021 IL 125617, at ¶ 74 (2021); *see also Johnson v. Winstead*, 447 F. Supp. 3d 715, 721 (N.D. Ill. 2019). The absence of any of these elements bars a plaintiff's malicious prosecution claim. *See Beaman*, 2021 IL 125617, at ¶ 74.

42

Defendants argue that they are entitled to summary judgment because: (1) the proceedings did not terminate in Zhang's favor in a manner indicative of innocence, and (2) there was probable cause to arrest Zhang. *See* Batavia Defs.' Mtn. for Summ. J., at 11 (Dckt. No. 196).

The first argument depends on the nature of the dismissal. The state dismissed Zhang's criminal charge through a *nolle prosequi* motion. *See* Batavia Defs.' Statement of Facts, at ¶ 43 (Dckt. No. 197).

The Illinois Supreme Court has adopted the majority rule that a "criminal proceeding has been terminated in favor of the accused when a prosecutor formally abandons the proceeding via a *nolle prosequi*, unless the abandonment is for reasons not indicative of the innocence of the accused." *See Beaman*, 2021 IL 125617, at ¶ 109 (citing *Swick v. Liautaud*, 169 Ill. 2d 1238, 215 Ill. Dec. 98, 662 N.E.2d 1238, 1242–43 (1996)).

At first blush, that sentence – standing alone – might sound like the Illinois Supreme Court created a default rule that a dismissal by *nolle prosequi* is a dismissal in favor of the accused. The Illinois Supreme Court basically said: "X, unless not Y." Read in isolation, that sentence could suggest that it is a dismissal in favor of the accused, unless there is a reason to conclude that it *wasn't*.

But the common-parlance understanding of what the Illinois Supreme Court said is, in reality, different than what it actually means. The rule is simple. A plaintiff must do more than rely on the fact that a criminal case was dismissed *nolle prosequi*. The plaintiff must show that the dismissal was indicative of actual innocence.

Sentences must be read in context. And here, *Beaman* cited *Swick v. Liautaud*, 169 Ill. 2d 504, 215 Ill. Dec. 98, 662 N.E.2d 1238, 1243 (1996). In *Swick*, the Illinois Supreme Court

43

made clear that the burden rests with the former criminal defendant (*i.e.*, the plaintiff in a later civil case) to show that the dismissal for *nolle prosequi* was based on innocence. "The burden of proof of a favorable termination, however, remains with the plaintiff. Only when a plaintiff establishes that the *nolle prosequi* was entered for reasons consistent with his innocence does the plaintiff meet his burden of proof." *Swick*, 662 N.E.2d at 1243 (citing Restatement (Second) of Torts § 672 (1977)). The key point followed: "Otherwise, every time criminal charges are nol-prossed a civil malicious prosecution action could result." *Id.*

*Beaman*'s express reliance on *Swick* suggests that the Illinois Supreme Court was sticking with the longstanding approach laid down in *Swick*. That reading of *Beaman* is consistent with the next few sentences of that opinion. In *Beaman*, the Illinois Supreme Court added that the mere existence of a *nolle prosequi* dismissal is not enough. "This court has stressed that it is the circumstances surrounding the entry of the *nolle prosequi* that must be examined and not the mere form or title of the disposition. To support a malicious prosecution claim, the circumstances surrounding the abandonment of the criminal proceedings must compel an inference that there existed a lack of reasonable grounds to pursue the criminal charge." *Beaman*, 2021 IL 125617, at ¶ 109 (citation omitted).

The facts and circumstances of the dismissal control, not the title of the dismissal. It is not enough to show a dismissal via *nolle prosequi*. A civil plaintiff must show the *reasons* for the dismissal.

So, one sentence in *Beaman* could be read to suggest that a dismissal by *nolle prosequi* is a termination in favor of the accused, unless the state abandoned the case for reasons other than innocence. But that passage actually means that a dismissal by *nolle prosequi* is *not* a termination in favor of the accused, unless the accused carries his burden of showing that the

dismissal was, in fact, for reasons indicative of actual innocence. *See generally* 54 C.J.S., Malicious Prosecution § 68 (2021) ("Generally, the abandonment of a prosecution by the prosecutor or a complaining witness that results in a discharge of the accused generally constitutes a termination in favor of the accused for purposes of a malicious prosecution claim, *at least where abandonment was under circumstances consistent with the innocence of the accused*. Similarly, the requirement of the termination of proceedings in the plaintiff's favor may be satisfied by a showing that a civil suit upon which a malicious prosecution claim is based was abandoned, although it may depend on the circumstances under which the suit is abandoned.") (emphasis added); *see also Beaman*, 2021 IL 125617, at ¶ 109 (citing 54 C.J.S., Malicious Prosecution § 68 (2021)). As the ensuing parenthetical in *Beaman* made clear, "abandonment of an action or entry of a *nolle prosequi for reasons that imply or are consistent with innocence*[] is sufficient to support a malicious prosecution claim." *See Beaman*, 2021 IL 125617, at ¶ 109 (emphasis added).

In sum, the Illinois Supreme Court said: "X, unless not Y." A dismissal by *nolle prosequi* is a termination in favor of the accused, unless there is a reason to think that it wasn't. But what that passage *actually* meant is: "if Y, then X." If there is a reason to conclude that the dismissal via *nolle prosequi* was indicative of innocence, then it was terminated in favor of the criminal defendant.[4]

Here, there is nothing in the record suggesting that the state dropped the criminal charge against Zhang for reasons indicative of her innocence. "A bare nolle prose without more is not indicative of innocence." *See Washington v. Summerville*, 127 F.3d 552, 558 (7th Cir. 1997); *see*

---

[4] As an aside, the phrase "X, unless not Y" is logically equivalent to "if Y, then X." *See* Colin Allen & Michael Hand, Logic Primer 13 (MIT Press 2d ed. 2001) ("'φ unless ψ' is also commonly translated as (∼ψ → φ)").

*also Woods v. Village of Bellwood*, 502 F. Supp. 3d 1297, 1318 (N.D. Ill. 2020); *Cui v. Kubycheck*, 2021 IL App (2d) 200239-U, at ¶ 24 (2021).

Even if the *nolle prosequi* was indicative of innocence, Zhang has another issue – probable cause. For purposes of a malicious prosecution claim, probable cause exists when the facts "would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged." *Williams v. City of Chicago*, 733 F.3d 749, 759 (7th Cir. 2013). The Court considers whether probable cause for the prosecution existed as of the filing of the charging document. *See Holland*, 643 F.3d at 254. But as discussed in detail above, no reasonable jury could find the absence of probable cause, so summary judgment is granted on Count V.

## IV.    Indemnification (Count VI)

Zhang's sixth claim is indemnification against the City of Batavia. But this Court is granting summary judgment to the Batavia Defendants on all of the claims, so there is nothing to indemnify. The Court grants summary judgment to the City of Batavia on Count VI.

### Conclusion

For the foregoing reasons, the Batavia Defendants and Defendant Schuster's motions for summary judgment are granted.


Date:   March 2, 2022                    _____

Steven C. Seeger
United States District Judge